IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOP GRADE CONSTRUCTION, | No. C-11-02194 EDL |
| Plaintiff, | **ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| FLUORESCO LIGHTING-SIGN MAINTENANCE, | |
| Defendant. | |

In this business dispute, Plaintiff Top Grade Construction, a general contractor, alleges a single claim for promissory estoppel against Defendant Fluoresco Lighting-Sign Maintenance, a subcontractor that provided a bid for sign and signal bridge work to be included in Plaintiff's bid to the City of Hayward on the Route 238 Corridor Improvement Project. Plaintiff alleges that Defendant wrongfully failed to honor its subcontractor bid and refused to do the sign and signal bridge work.

Defendant filed this motion for summary judgment, arguing that Plaintiff's promissory estoppel claim fails as a matter of law because Plaintiff failed to accept Defendant's bid proposal within a reasonable period of time but, instead, countered the proposal with a subcontract containing material terms not included in Defendant's bid. Alternatively, Defendant argues that Plaintiff's promissory estoppel claim fails because Plaintiff has unclean hands.

On March 13, 2012, the Court held a hearing on Defendant's Motion for Summary Judgment. At the hearing, Defendant stated that for purposes of this motion, Defendant accepted

that the bid amount was $746,647.92 and that promissory estoppel does not apply. Defendant argued that the case turned on whether Plaintiff misrepresented Defendant's bid amount to the City in the prime bid, thereby establishing that Plaintiff had unclean hands and could not prevail in this matter. Having considered all of the parties' briefs and oral argument, the Court hereby denies Defendant's Motion for Summary Judgment.

**FACTS**

In about April 2010, the City of Hayward published plans and specifications and solicited bids for its Route 238 Corridor Improvements Project. Morales Decl. Ex. 1. The Project included roadway widening and rehabilitating and construction of curb, sidewalk, median, bridge rail, traffic devices, traffic signal bridges, signs, lighting, joint trenches, storm drain and water systems and landscaping. Declaration of Rick Morales ¶ 7. The bid documents contained 253 bid items. Morales Decl. Ex. 1. In June 2010, Plaintiff was preparing to submit a bid to the City for the entire Project. Morales Decl. ¶ 4. Bids were due by 2:00 p.m. on June 22, 2010. Morales Decl. Ex. 1.

After April 2010, Defendant purchased from the City a bid package for the Project, and prepared a bid to perform the signage work on the Project. Burns-Coffin Decl. ¶ 3. On Bid Day, Defendant learned from Plaintiff's senior estimator, Rick Morales, that there was a geotechnical/soils report that the City failed to provide to Defendant in their bid package. Id.

At 10:37 a.m. and 11:17 a.m. on June 22, 2010, Defendant faxed its bid to Plaintiff. Morales Decl. ¶¶ 9-10; Ex. 4; Leslie Decl. Ex. 1 at Ex. 3. At 12:32 p.m. and 12:36 p.m. on June 22, 2010, Defendant faxed Plaintiff a bid to perform the signage work on the Project at a cost of $757,143.23. Morales Decl. ¶¶ 11-12; Ex. 5; Burns-Coffin Decl. ¶ 4; Ex. A; Leslie Decl. Ex. 1 at Ex. 4.

Jared Burns-Coffin, Defendant's employee, called Morales on June 22, 2010 at 1:13 p.m. to discuss Defendant's bid. Burns-Coffin Decl. ¶ 5. Burns-Coffin states that during that call, Morales informed him that bid item #65 may involve hard rock drilling and dewatering. Id. Defendant had not accounted for the cost of this hard rock drilling and dewatering in its bid because it did not have the geotechnical/soils report from the City. Id. Plaintiff needed to hand-deliver the bid to the City by 2:00 p.m., so according to Burns-Coffin, Morales was hurried during this call. Id. ¶ 6. According to Burns-Coffin, Morales asked Burns-Coffin to provide him with a number to cover this

additional drilling work, and Burns-Coffin told Morales to increase Defendant's bid by $30,000 to cover the anticipated cost of the additional drilling work. Id. According to Burns-Coffin, Morales agreed to that amount and said he would add the $30,000 to Defendant's bid. Id. When Burns-Coffin checked the bid results for the Project on the Internet after June 22, 2010, he found that Plaintiff listed Defendant as a subcontractor on the Project at the bid of $787,410.00, which, according to Burns-Coffin, included the $30,000 that he and Morales had agreed to add to Defendant's bid. Burns-Coffin Decl. ¶ 7; Ex. B. Therefore, he took no further action to confirm the increased bid amount. Id. Morales denies that he had a conversation with Burns-Coffin on June 22, 2010 in which Morales agreed to a $30,000 increase in Defendant's bid for bid item #65. Morales Decl. ¶ 18; Burns-Coffin Decl. ¶ 10 ("He [Morales] denied ever speaking with me on Bid Day.").

The City awarded the contract to Plaintiff on July 20, 2010. Morales Decl. ¶ 16. On July 21, 2010, Morales sent letters of intent to the subcontractors, including Defendant, that Plaintiff used in its bid. Morales Decl. ¶ 17; Ex. 7; Burns-Coffin Decl. ¶ 8; Ex. C. On July 28, 2011, at Burns-Coffin's request, Plaintiff's administrative assistant, Ronnie Caillault, sent Burns-Coffin a sample subcontract form. Caillault Decl. ¶¶ 3-4; Ex. 1. Also on July 28, 2010, Darren Wilhoit, Plaintiff's Senior Project Manager, and Burns-Coffin exchanged emails in which Burns-Coffin asked when Plaintiff would be sending the actual Subcontract for the Project because Defendant "would like this as soon as possible so we can start preparing the material submittals." Wilhoit Decl. Ex. 1. Wilhoit responded that Subcontracts were in process, but that Plaintiff needed additional information from Defendant such as lead time and activity durations. Id.; Caillault Decl. Ex. 2. Also on July 28, 2010, Plaintiff sent a letter to Defendant regarding the required project submittals and information, asking Defendant to submit, among other things, "all required submittals as per the project's specifications that apply to your work," "a schedule timeline of your items of work per location, indicating the number of days to complete as well as your critical path items," and "primary contact names and phone numbers for all construction and contractual matters." Sayabeth Decl. Ex. 1. On August 5, 2010, Caillault sent an email to Burns-Coffin and others stating that the conformed plans and specifications for the Project were available at Plaintiff's office, and that she was following up on the status of submittals and schedules, which should be submitted as soon as possible. Caillault

3

Decl. Ex. 3.

By letter dated September 9, 2010, Plaintiff sent Defendant its Long Form Standard Subcontract for Defendant's work on the Project. Burns-Coffin Decl. ¶ 9; Ex. D; Well Decl. ¶ 1; Ex. 1. The Subcontract Agreement was the one that Plaintiff used in public works projects and with the exception of scope and price, is signed by all subcontractors, and was signed by all subcontractors on the Route 238 Corridor Improvements Project. Wells Decl. ¶ 3. The Subcontract lists the total amount for Defendant's work at $746,547.97. Id. Burns-Coffin immediately called Morales to discuss the Subcontract price, which Burns-Coffin believed was $40,000 less than Defendant's bid, and reminded him of their Bid Day conversation, which Morales denied. Burns-Coffin Decl. ¶ 10. According to Burns-Coffin, Morales was unable to explain why Plaintiff had listed Defendant's price as $787,410.00 in the bid to the City, but only listed it as $746,547.97 in the Subcontract. Burns-Coffin Decl. ¶ 10.

On September 15, 2010, Joseph Licari, Defendant's Oakland Branch Manager and Burns-Coffin's supervisor, sent an email to Sy Sayabeth, Plaintiff's Senior Project Engineer and others, seeking more information about some aspects of the working relationship, and stating: "We look forward to working on this Project." Sayabeth Decl. ¶ 2. In another email on September 15, 2010, Licari states that he received the Subcontract, which he forwarded on to the contract administration. Sayabeth Decl. Ex. 3.

On September 20, 2010, Licari emailed Morales forwarding Burns-Coffin's email explaining the discrepancy between the Subcontract price and Defendant's bid price. Burns-Coffin Decl. ¶ 11; Ex. E. Burns-Coffin stated that Defendant did not hear back from Morales in response to Licari's September 20, 2010 email, and thereafter sent another email on September 22, 2010 to Morales forwarding Burns-Coffin's email explaining the discrepancy. Burns-Coffin Decl. ¶ 12; Ex. F. Morales stated in his declaration, however, that he called Licari in response on about September 20, 2010 in response to his email, and that in that call, he denied having the Bid Day conversation with Burns-Coffin to increase Defendant's bid by $30,000. Morales Decl. ¶ 18. Burns-Coffin stated that he did not hear back from Morales and so on September 28, 2010, sent another email forwarding his email explaining the discrepancy. Burns-Coffin Decl. ¶ 13; Ex. G. Burns-Coffin stated that he

4

finally heard back from Morales in October 2010. Burns-Coffin Decl. ¶ 14. According to Burns-Coffin, in that call, Morales refused to honor the Bid Day agreement to increase Defendant's bid for the drilling work, and could not explain the reason for the difference between the cost of Defendant's work listed by Plaintiff in its bid to the City and the amount listed on the Subcontract. Burns-Coffin Decl. ¶ 14.

Plaintiff's Public Works Estimating Manager, Scott Erwin, stated in his declaration that Plaintiff's listing of Defendant as a subcontractor in its bid in the amount of $787,410.00 was an error. Erwin Decl. ¶ 13. Erwin stated that Plaintiff relied on Defendant's bid of $746,547.92, not including the 2% bond rate. Id. Morales explained in his declaration that Plaintiff relied on Defendant's revised bid of $746,597.92 by using that amount in calculating Plaintiff's bid price to the City. Morales Decl. ¶ 14; Lewis Decl. Ex. 25. Morales further stated that Plaintiff's bid document to the City shows $787,419.92, and that this was an error. Id.; Lewis Decl. Ex. C Ex. 1. Morales explained:

> In estimating Top Grade prepares an outline of all the work based on the bid items, in this case there were 253 bid items. As we generally do until the final stages of bidding, we used what are called "plugs" or "plug numbers" where we did not have an estimate of our own or a bid from a subcontractor or supplier. The plug numbers are very rough estimates. In this case we thought the subcontractors bidding the sign and signal work would include the removal of the existing signs structures, so we grouped bid item 41 under what we called architectural signage. To track the bidding process, and to ensure we have given enough work to "Local Business Enterprises" minority companies, etc., to satisfy the City specification requirements, we put estimate numbers on large sheets of papers on the walls of the bid room. Attached hereto as Exhibit 6 is a copy of one of those sheets showing we were looking at different bidders for what we summarized as "Arch. Signage" showing "Fluoresco (TGC $15,000) 802, 410." This $802,410 included $51,900 for bid item 41 "remove overhead sign structures." that Fluoresco ended up not bidding, but was had already packaged with the items Fluoresco did bid for our companies purposes. In listing Fluoresco's projected subcontract amount in subcontractor listing in bid the $15,000 for bond was subtracted from the $802,410.02 resulting in the erroneous $787,410.02. In our bid to the owner we included $746,597.92 bid by Fluoresco and after this bid Top Grade intended to subcontract with Fluoresco for the $746,547.92, plus pay for their bond at 2%, if we were awarded the contract.

Morales Decl. ¶ 14.

On November 18, 2010, Herman Dreier, Defendant's Contract Administrator, sent an email to Terri Wells, Plaintiff's contract administrator, containing proposed modifications to the Long Form Standard Subcontract that Plaintiff had asked Defendant to sign. Dreier Decl. ¶ 3; Ex. A.

5

Defendant's proposed modifications were called "Special Conditions." Id. By an email dated November 29, 2010, Wells forwarded Dreier's email to Morales. Morales Decl. ¶ 19; Ex. 7. Morales stated that Plaintiff could have refused to consider Defendant's Special Conditions as an improper attempt to change its bid, but instead, Plaintiff worked with Defendant to resolve the issues. Morales Decl. ¶ 20. Dreier stated that he made numerous calls to Morales about the Special Conditions, but that Morales did not return his calls for some time. Dreier Decl. ¶ 4. Morales spoke with Dreier on the phone on December 8, 2010 and several times thereafter regarding the Special Conditions. Morales Decl. ¶ 20. Dreier stated that Morales did not call him back until December 14 or 15, 2010. Dreier Decl. ¶ 5. Although Morales and Dreier disagree on whether some of the items on the list were resolved satisfactorily to one side or the other, they agree that after four months of negotiations, there remained two outstanding unresolved issues, that is, the liquidated damages provision and the payment for drilling work. Morales Decl. ¶ 21; Dreier Decl. ¶ 6.

On December 13, 2010, Plaintiff's administrative assistant Caillault responded to the City's request for subcontractor information with a spreadsheet that listed the subcontract amount for Defendant as $746,547.97. Caillault Decl. ¶ 7; Ex. 4.

On January 13, 2011, there was an exchange of emails between Defendant's Dreier and Plaintiff's Wilhoit regarding the question of liquidated damages. Wilhoit Decl. Ex. 2. Wilhoit was concerned about Defendant's proposed $125 per day liquidated damages provision because it would not cover the delay impacts, assuming that Defendant was at fault for the delays. Wilhoit Decl. Ex. 2; see also Wells Decl. Ex. 3.

Morales stated, however, that the liquidated damages and bid item #65 issues were resolved in a conversation between Morales and Chuck Finzer, Dreier's supervisor, in February 2011, in which Morales told Finzer that Plaintiff would agree to limit the City's liquidated damages that could be passed on to Defendant for delay to $2,500 per day and would agree to Defendant's request to remove bid item #65 from Defendant's Subcontract so that the soils report and additional drilling would no longer be an issue. Morales Decl. ¶ 22. Morales also stated that during that phone call, Finzer stated that Defendant's bond rate was 4%, even though Defendant had quoted 2% at the time of the bid, but that Morales agreed to that rate. Morales Decl. ¶ 22; Erwin Decl. Ex. 2. Morales

6

stated that Finzer and Morales agreed that this concluded the issues raised by Defendant and that Finzer would have Dreier make the changes and get the revised Subcontract signed and returned to Plaintiff. Morales Decl. ¶ 22. Morales stated that he subsequently informed Plaintiff's Public Works Estimating Manager, Scott Erwin, and Wells that Morales had spoken with Finzer and that there was an agreement on the Subcontract. Morales Decl. ¶ 23. Erwin sent an email to other of Plaintiff's employees with a copy to Morales informing them that Morales had talked with Defendant and had agreed to the reduced liquidated damages and to take bid item 65 out of Defendant's bid. Erwin Decl. Ex. 2. Wells stated in her declaration that in late February or early March 2011, she was told that the subcontract terms with Defendant had been resolved. Wells Decl. ¶ 7.

Dreier, however, stated in his declaration that the liquidated damages and additional drilling issues remained unresolved as of March 2011. Dreier Decl. ¶ 6. There are emails from February 7 and 22, 2011 showing that there was still no agreement on these issues as of those dates. Wilhoit Decl. Ex. 3, 4.

On March 22, 2011, Morales received a copy of an email from Dreier stating that "the contract is with the owners" and that he would follow up with them and advise of the contract status either that day or the next. Morales Decl. ¶ 24; Ex. 8; Wells Decl. Ex. 5. On March 28, 2011, Morales stated that he received a phone call from Dreier stating that Defendant was not going to do the Project because of problems it had with similar welding specifications on projects in Las Vegas and Los Angeles, and because it would impact their resources. Morales Decl. ¶ 25. A March 22, 2011 email from Defendant's Project Manager Jason Firth that was forwarded to Erwin asks whether a certain welding certification was applicable to Defendant's scope of work. Erwin Decl. Ex. 3; Wilhoit Decl. Ex. 5. Erwin sent an email on March 28, 2011 to Morales and other of Plaintiff's employees stating that the "worst case scenario" has developed with Defendant because Defendant was refusing to sign their Subcontract. Erwin Decl. Ex. 4. In that email, Erwin asked about other subcontractors who might be able to do the work, asked to set up a meeting between the companies' principals, and asked about legal options. Id. On March 30, 2011, at Defendant's request, Erwin sent an email to Dreier containing a spreadsheet comparing the subcontractor bids that Plaintiff had

7

received at bid time for the contract bid items that Defendant had bid. Erwin Decl. Ex. 5. Dreier responded on the same day acknowledging receipt of the comparison sheet. Erwin Decl. Ex. 6.

However, Defendant's president Ladd Kleiman, stated that he made the decision that Defendant would not move forward with the Project. Kleiman Decl. ¶ 3. On April 6, 2011, Kleiman sent a letter to Plaintiff's Executive Vice President Robert Fisher, informing him that Defendant would not proceed with the Project because of the changed scope of work and the inability of the parties to agree on material terms in the subcontract. Kleiman Decl. ¶ 3; Ex. A. The change in scope of work referred to Plaintiff's refusal to honor their Bid Day agreement to pay Defendant an additional $30,000 for the hard rock drilling and dewatering in bid item #65. Kleiman Decl. ¶ 4. Kleiman acknowledged that Plaintiff agreed to resolve this issue by deleting the bid item from Defendant's subcontract, but Kleiman stated that the proposed change in scope would have reduced the subcontract price to approximately $697,000. Kleiman Decl. ¶ 4; Ex. B. The material terms of the subcontract referenced in Kleiman's letter were the eleven unresolved items on the Special Conditions list, especially the liquidated damages provision. Kleiman Decl. ¶ 5; Ex. B.

Thereafter, Plaintiff submitted a request to the City to substitute Defendant as a subcontractor (Wilhoit Decl. Ex. 6), which was approved because "Fluoresco did not have all of the relevant project materials prior to the bid and has no agreement on the material terms for a subcontract for the project." Kleiman Decl. ¶ 6; Ex. C; Wilhoit Decl. Ex. 7, 8. Later, on June 8, 2011, Kleiman sent a letter to the City and to Plaintiff's Wilhoit reiterating that Defendant did not have all of the relevant project materials prior to the bid and that Plaintiff and Defendant were unable to reach an agreement on subcontract terms after nine months of negotiations. Wilhoit Decl. Ex. 9.

Morales stated that from June 2010 until the end of March 2011, Plaintiff considered that Defendant was Plaintiff's subcontractor for the sign and signal bridge work on the Project. Morales Decl. ¶ 26. Morales did not contact any other subcontractor for that work during that time except when Plaintiff was considering whether to agree with Defendant's request that Defendant be able to remove bid item #65 from its bid, at which time Morales contacted Malcolm Drilling to see if they would hold their June 22, 2010 quote for pile drilling, and then Morales agreed to remove bid item

8

#65 from Defendant's subcontract.  Morales Decl. ¶ 26.

**LEGAL STANDARD**

Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c).  Material facts are those which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.  The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial.  Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case.  Id.  If the moving party meets its initial burden, the opposing party "may not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial."  See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250.  If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law."  Celotex, 477 U.S. at 323.

**DISCUSSION**

Defendant stated at the March 13, 2012 hearing that its main argument on summary

9

judgment is that Plaintiff proceeded with unclean hands and therefore may not maintain this action.[1] The doctrine of unclean hands requires "that a plaintiff act fairly in the matter for which he seeks a remedy." Mendoza v. Ruesga, 169 Cal.App.4th 270, 279 (2008). "[I]t is an equitable rationale for refusing a plaintiff relief where principles of fairness dictate that the plaintiff should not recover, regardless of the merits of his claim." Id. The doctrine applies where a plaintiff acted unconscionably, or exhibited bad faith or inequitable conduct in connection with the matter in controversy. Id. "Unclean hands ... provides a complete defense to both legal and equitable causes

---

[1] Although Defendant stated at the hearing that for purposes of this motion, Defendant was relying only on the unclean hands argument, the Court notes that there also is a triable issue of fact as to whether Plaintiff accepted Defendant's bid in a timely manner. See, e.g., Guzman v. Visalia Cmty. Bank, 71 Cal.App.4th 1370, 1376-77 (1999) ("The interpretation of the purported acceptance or rejection of an offer is a question of fact. Further, based on the general rule that manifested mutual assent rather than actual mental assent is the essential element in the formation of contracts, the test of the true meaning of an acceptance or rejection is not what the party making it thought it meant or intended it to mean. Rather, the test is what a reasonable person in the position of the parties would have thought it meant.") (internal citations omitted).

There is evidence raising a triable issue of fact that Plaintiff accepted Defendant's bid before tendering a subcontract. On the one hand, Defendant points to the evidence showing that Plaintiff did not provide Defendant with the subcontract until eight weeks after being awarded the prime contract, and argues that therefore, Plaintiff did not accept the subcontract bid within a reasonable time. Defendant notes that Plaintiff claims to be an experienced highway construction company and that Morales claims to have thirty-three years of relevant experience, so Plaintiff knew how to accept a bid if it wanted to, but instead Plaintiff only issued a Letter of Intent.

On the other hand, Plaintiff points to evidence that Plaintiff sent a Letter of Intent dated July 21, 2010 (one day after Plaintiff was awarded the prime contract) stating "Upon subsequent award of contract from the City of Hayward, please consider this letter as written notice that TGC intends to use Fluoresco Lighting as a subcontractor on this project." Burns-Coffin Decl. Ex. C. Second, on July 28, 2010, Plaintiff sent an email to Defendant informing Defendant that Plaintiff had been awarded the contract, and asking Defendant to provide numerous documents, including a schedule timeline of work and all required submittals as per the project specifications. Sayabeth Decl. Ex. 1. Third, on August 5, 2010, Plaintiff sent a follow up email to Defendant and two other subcontractors asking for performance. Caillault Decl. Ex. 3 ("The conformed plans and specs for the above project is ready to be picked up at our Fremont office. . . . Also, I want to follow up with you on the status of your submittals and your schedule."). Fourth, on September 14, 2010, Defendant attended a pre-construction meeting to plan their work on the project and followed up with an email saying "We look forward to working with you on this project." Sayabeth Decl. Ex. 2. Fifth, on September 17, 2010, Defendant provided Plaintiff with a contractually required Certificate of Insurance. Leslie Decl. Ex. 29. Sixth, there is evidence that Defendant signed the subcontract agreement, but did not send it. Leslie Decl. Ex. 3 (Dreier Depo. at Ex. 29). The fact that Dreier may have prepared an enclosure letter as part of his job and had no knowledge of whether the terms of the agreement reflected the agreement of the parties does not, by itself, establish that there was no counteroffer. However, when combined with other evidence, this evidence supports a finding of a triable issue of fact. Seventh, there is an internal email from February 2011 among Defendant's employees that makes it seem as if Defendant believed it was "stuck" in the contract with Plaintiff. Leslie Decl. Ex. 24. In addition, according to Plaintiff, the parties resolved the Special Conditions proposed by Defendant, yet Defendant still refused to sign the subcontract and denies that the Special Conditions have been resolved.

of action." Id.; Adler v. Fed. Republic of Nigeria, 219 F.3d 869, 876-77 (9th Cir.2000) ("In California, the unclean hands doctrine applies not only to equitable claims, but also to legal ones.").

Defendant argues that Plaintiff has unclean hands because Plaintiff represented to the City that the cost of Defendant's work was $787,410.00, yet Plaintiff subsequently insisted that Defendant perform the work for the original bid price of $746,547.92. Defendant assumed for this motion that the original bid was for $746,547.92. However, Defendant argues that Plaintiff's insistence on the lower amount means that Plaintiff intentionally misrepresented the amount of Defendant's subcontractor bid in Plaintiff's prime bid, thus defrauding the City and the public. Defendant argues that Plaintiff has never adequately explained this discrepancy, and has only offered an explanation that Plaintiff intended to perform some of the work it included in the cost of Defendant's bid. See Lewis Decl. Ex. C (Morales Depo.) at 10-11, 13, 15-16.

Defendant, however, has failed to meet its burden of showing undisputedly that Plaintiff had unclean hands. See Ghirardo v. Antonelli, 14 Cal.4th 39, 54 (1996) (party pleading affirmative defense has burden of proof). Defendant has presented no evidence to show that Plaintiff intentionally misrepresented Defendant's bid to the City, and there is a triable issue of fact as to whether the number submitted in the prime bid was a mistake on Plaintiff's part or the result of an agreed increase. Defendant's unclean hands theory hinges on its argument that paragraph 14 of the Morales declaration, in which Morales explained how the bid numbers were calculated to include in the prime bid, is a sham.

In order to find paragraph 14 to be a "sham," the Court must be satisfied that it "flatly contradicts" Morales' earlier deposition testimony or Plaintiff's earlier discovery responses, and that it was provided for the sole reason of creating a genuine issue of fact for trial. Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir.1991) (citation omitted). In Kennedy, the Ninth Circuit explained that the sham declaration rule should be applied with caution, and that the rule does "not does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony. Rather, [the rule is] concerned with 'sham' testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment." Id. at 267; see also Sch. Dist. No. 1J v. ACandS, Inc., 5 F.3d 1255, 1264 (9th

11

Cir.1993) (sham declaration rule to be applied with caution). Before applying the harsh sanction of striking a declaration, the district court must make a factual determination that the contradiction was actually a "sham." Id.

In Messick v. Horizon Industries Inc., 62 F.3d 1227, 1231 (9th Cir.1995), the court explained that a declaration will not be considered a sham when it is offered to elaborate, explain or clarify earlier deposition testimony in the context of an honest discrepancy, mistake, or newly discovered evidence. Id. ("[t]he non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition [and] minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit."). However, when subsequent testimony flatly contradicts earlier sworn testimony, it will be found to have been "sham" testimony.

The Morales declaration, paragraph 14, states:

> In estimating Top Grade prepares an outline of all the work based on the bid items, in this case there were 253 bid items. As we generally do until the final stages of bidding, we used what are called "plugs" or "plug numbers" where we did not have an estimate of our own or a bid from a subcontractor or supplier. The plug numbers are very rough estimates. In this case we thought the subcontractors bidding the sign and signal work would include the removal of the existing signs structures, so we grouped bid item 41 under what we called architectural signage. To track the bidding process, and to ensure we have given enough work to "Local Business Enterprises" minority companies, etc., to satisfy the City specification requirements, we put estimate numbers on large sheets of papers on the walls of the bid room. Attached hereto as Exhibit 6 is a copy of one of those sheets showing we were looking at different bidders for what we summarized as "Arch. Signage" showing "Fluoresco (TGC $15,000) 802, 410." This $802,410 included $51,900 for bid item 41 "remove overhead sign structures" that Fluoresco ended up not bidding, but was had already packaged with the items Fluoresco did bid for our companies purposes. In listing Fluoresco's projected subcontract amount in subcontractor listing in bid the $15,000 for bond was subtracted from the $802,410.02 resulting in the erroneous $787,410.02. In our bid to the owner we included $746,597.92 bid by Fluoresco and after this bid Top Grade intended to subcontract with Fluoresco for the $746,547.92, plus pay for their bond at 2%, if we were awarded the contract.

Defendant argues that this paragraph is flatly contradicted by Morales's deposition and Plaintiff's interrogatory responses. In his deposition, Morales stated:

> Q: And looking at the second page of the exhibit, how would you arrive at those numbers?
> A: Those numbers are generated by our computer system, our estimating system, and they are pricing that are -- that we received through the day from our subcontractors and our self-performed work.
> . . .

12

> Q: Can you tell me what that document is?
> A: This is the listing of subcontractors that we had selected to do the project for us.
> Q: And it has the name and address, description of work, and dollar amount of subcontractor's work. What does that represent, the dollar amount of subcontractor's work?
> A: Those are the contract amounts that we had allotted for each particular subcontractor.
> Q: And for Fluoresco, you have a number of $787,410. Do you know how you arrived at that number?
> A: Yes, it's a combination of Fluoresco's bid, and we have some plug numbers to come up -- we had -- Fluoresco had -- as far as our systems, we had listed Fluoresco with other aspects that they didn't cover, as far as their work's concerned.
> . . .
> Q: So even though you were going to perform the work, you put the amount of money to do that work into Fluoresco's number?
> A: Right, because that's how our subsystem was set up, our bid categories were set up. For this particular item, we had included the removal of the overhead structures.
> . . .
> Q: And again, the [bid to the] City of Hayward, in the results, had Fluoresco Lighting and Signs at 787,410?
> A: Uh-huh, yes.
> Q: That was not actually the number, because that included some of the work that Top Grade was going to perform?
> A: Correct.
> . . .
> Q: So you represented to the City of Hayward that the contract with Fluoresco was 787,410 but that was not accurate?
> A: That was our estimated number at bid time.
> Q: Okay. And that was your estimate of your contract with Fluoresco, plus work you were going to do in-house?
> A: Correct.

Lewis Decl. Ex. C at 10-16.  Further, Plaintiff's response to interrogatory 1 states:

> Interrogatory 1: State all reasons why you represented in your proposal to the City of Hayward that the cost of Defendant's work on the project was $787,410 when Defendant's bid to you was for a lesser amount.
> Response: Objection, responding party did not "represent to the City of Hayward that the cost of Defendant's work on the project was $787,410."

Lewis Reply Decl. Ex. B.  Plaintiff also responded as follows to interrogatory 2:

> Interrogatory 2: Describe any work you intended to preform on the project that you included in the cost of Defendant's work listed on the proposal, including the type of work and the cost of the work.
> Response: Objection, unclear. Subject to and without waiving this objection, responding party included costs for removing the overhead sign structures at a unit price of $17,300 and $1,048.20 of bond cost.

Lewis Reply Decl. Ex. B.

13

1    Because paragraph 14 does not "flatly contradict" the earlier deposition testimony or
2 interrogatory responses, it is not a sham.  Instead, given Plaintiff's explanation at the hearing
3 regarding how the bidding process works, that is, that Plaintiff plugs in numbers for the bid items
4 that subcontractors did not bid so that Plaintiff can evaluate the subcontractor bids on a level playing
5 field, paragraph 14 is more akin to an explanation or clarification than a contradiction.  Further, the
6 amount of Plaintiff's bid to the City was for Defendant's work is not dispositive because Morales
7 has consistently stated that the bid to the City included Defendant's proposal plus Plaintiff's work.
8 Plaintiff stated in the interrogatory responses that it did not represent that Defendant's bid amount
9 was $787,410, which is not clearly inconsistent with his deposition testimony and declaration.

10    Defendant also argues that Plaintiff gave an inconsistent response to interrogatory 2 in which
11 Defendant asked Plaintiff to describe the work it intended to perform on the project that it included
12 in the cost of Defendant's work on the bid.  Plaintiff responds that it included the cost of removing
13 overhead signs at a unit price of $17,300 and $1,048.20 of bond cost.  Lewis Reply Decl. Ex. B at
14 Int. 2.  Morales' declaration testimony claims the discrepancy was the result of a $15,000 bond and
15 $51,900 in cost for sign removal.  Morales Decl. ¶ 14.  While these statements appear inconsistent,
16 they do not show unclean hands as a matter of law.  Moreover, the question of whether Morales'
17 explanation of the bid amounts makes sense is for the trier of fact.  Thus, the Court denies
18 Defendant's request to strike paragraph 14, and finds that there is a triable issue of fact as to whether
19 Plaintiff had unclean hands.

20    The Court is concerned, however, that the numbers in the declaration appear to be
21 inconsistent with the interrogatory response.  For example, assuming that Defendant's bid was
22 $746,547.92, and according to Plaintiff, Plaintiff added $51,900 to that bid for work not bid by
23 Defendant, the total would be $798,447.92, not $802,410 as stated in the declaration.  As another
24 example, the declaration states that a bond cost of $15,000 was subtracted from Defendant's bid, but
25 the interrogatory response says that bond cost was $1,048.  Nevertheless, these examples are not
26 sufficient to show that paragraph 14 is a sham.
27 //
28 //

14

**CONCLUSION**

For the reasons stated in this Order, Defendant's Motion for Summary Judgment is denied.

**IT IS SO ORDERED.**

Dated: April 3, 2012

*Elizabeth D. Laporte*
ELIZABETH D. LAPORTE
United States Magistrate Judge